AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

United States of America
v.
FRANK FIORE and
ANTHONY CARBONE

*Defendant(s)*

Case No. 14-8295-JMH

FILED by ______ D.C.
JUL 28 2014
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of 01/24/2014 thru 7/21/2014 in the county of Palm Beach in the Southern District of Florida, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC § 846, and<br>21 USC § 841(a)(1) and (b)(1)(B) | Conspiracy to possess schedule I, III and IV controlled substances with intent to distribute, involving 500g or more of cocaine. |
| 18 USC § 371, and<br>18 USC § 2320(a)(4) | Conspiracy to traffic in counterfeit drugs. |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

S/A Maximillian L. Trimm, FDA
*Printed name and title*

I find probable cause. JMH

Sworn to before me and signed in my presence.

Date: 07/28/2014

[signature]
*Judge's signature*

City and state: WEST PALM BEACH, FLORIDA

JAMES M. HOPKINS, U.S. MAGISTRATE JUDGE
*Printed name and title*

AFFIDAVIT

I, Maximillian L. Trimm, having been duly sworn, depose and state as follows

1. I am a Special Agent with the Food and Drug Administration (the FDA), Office of Criminal Investigations (OCI), and have been so employed since August 2010. Prior to that, I was employed as a Special Agent with the Department of Homeland Security for over seven years. As a Special Agent with the FDA, I attended training at the Federal Law Enforcement Training Center in Glynco, Georgia, and the FDA/OCI Special Agent training program. I am authorized to conduct criminal investigations, make arrests, and execute search and arrest warrants for offenses in violation of the Federal Food, Drug and Cosmetic Act, Title 21, United States Code, Sections 301 through 395, and violations of Title 18, and Title 21 United States Code.

2. This affidavit is based upon my personal knowledge, my review of evidence obtained during the course of this investigation, and information provided by other law enforcement officers and regulatory officials through the course of the investigation. Because this affidavit is submitted solely for the purpose of establishing probable cause to support the issuance of a search warrant and seizure warrants, it does not set forth all facts and circumstances known to me or to other investigators regarding this matter.

3. This affidavit is submitted in support of applications for the issuance of a complaint charging FRANK FIORE and ANTHONY CARBONE with conspiring to violate 18 U.S.C. 2320(a)(4) (trafficking in counterfeit drugs) and 21 U.S.C. 841(a)(1) (distribution of controlled substances); a complaint charging GARY LEE JONES with a violation of 18 USC 922(g)(1) (possession of a firearm by a felon); warrants to search HAVANA NIGHTS CIGAR LOUNGE, 514 VIA DE PALMAS, BOCA RATON, FLORIDA 33432 (Subject Premises 1), 4349

NORTHWEST 1ST PLACE, DEERFIELD BEACH, FLORIDA 33442 (Subject Premises 2), and the email accounts flexibletubeman@aol.com, prestigegroup1@aol.com, and Prestigellc8@aol.com; and warrants to seize one light blue 1991 Mercedes Benz 560SEL, vehicle identification number WDBCA39E0MA594789, bearing Florida Plate 371-MUM (Subject Vehicle 1), and one gold 2011 BMW 740i, vehicle identification number WBAKA4C56BC612738, bearing Florida Plate BVGA96 (Subject Vehicle 2). The two subject premises are more fully described in Attachment A.

4. Based on information developed during this investigation, and as set forth in more detail below, there is probable cause to believe that FRANK FIORE, ANTHONY CARBONE, and GARY LEE JONES have violated 18 U.S.C. 2320(a)(4) (trafficking in counterfeit drugs) and 21 U.S.C. 841(a)(1) (distribution of controlled substances) and have conspired to commit those offenses, that JONES has violated 18 USC 922(g)(1) (possession of a firearm by a felon); that evidence of these violations will be found at the Subject Premises; and that the Subject Vehicles were used and intended to be used to facilitate the violations of 18 U.S.C. 2320(a)(4) and 21 U.S.C. 841(a)(1) and therefore are subject to forfeiture pursuant to 18 U.S.C. 2323(a)(1)(B) & (b)(1) and 21 U.S.C. 853(a)(2).

5. As discussed below, this case was investigated using the assistance of a Cooperating Subject ("CS") and two undercover Palm Beach County Sheriff's Narcotics Agents ("UC1" and "UC2"). The CS is a target in an investigation in the Western District of Virginia and is cooperating in hopes of receiving leniency in sentencing in that case. In addition, according to the AUSA assigned to the CS's case in the Western District of Virginia, agents in that district have evidence that the CS committed an additional offense, and that that offense was ongoing while the CS was cooperating in this investigation. In particular, the AUSA stated that the CS participated

in a tax fraud by underreporting sales at his business. The AUSA estimated that the loss to the government from this additional offense was $18 million. In a separate matter, UC1 has been charged in Florida state court with false statements and possession of cocaine and has been placed on administrative leave pending the outcome of the charges. UC1 was charged and placed on administrative leave after his participation in this investigation.

6. Except where stated otherwise, all the in-person meetings involving the UCs discussed in this affidavit were video- and audio-recorded and all the telephone conversations were audio-recorded.

7. During the course of this investigation, HAVANA NIGHTS CIGAR BAR AND LOUNGE was in the process of opening and under construction for the majority of the time. On 9/23/2013, Florida Division of Corporations records reflected that FIORE was the president and registered agent of HAVANA NIGHTS CIGAR BAR AND LOUNGE INC. using his residence in Parkland, Florida as the principal place of business. On 10/24/2013, Florida Division of Corporations records reflected that Anthony CARBONE was the manager and registered agent of a corporation with a similar name, HAVANA NIGHTS CIGAR BAR & LOUNGE II, LLC located at 514 VIA DE PALMAS, BOCA RATON, FLORIDA 33432.

8. On January 24, 2014, as a result of the initial information I received in this case, FDA/OCI Special Agent John Masalski and I instructed the CS to conduct a meeting with FIORE. The CS arranged to meet FIORE at FIORE's business location, Subject Premises 1, that afternoon to discuss the distribution of counterfeit pharmaceuticals in the South Florida area, specifically, XANAX, CIALIS, VIAGRA and ABILIFY.

9. The CS met FIORE at Subject Premises 1 at approximately 1440 hours. This meeting was audio-recorded. FIORE introduced the CS to "Gary", who he stated is the actual

manufacturer of the counterfeit drugs. "Gary" was later identified as JONES. Law Enforcement records checks revealed that JONES is a convicted felon: In 1987, JONES was convicted of delivering and receiving counterfeit notes, in violation of 18 U.S.C. § 473 in the District of Connecticut. JONES gave the CS a small bag of 20 tablets as a sample. The tablets appeared to be counterfeit XANAX. JONES stated that he could sell as much as the CS wanted of the XANAX tablets and could make ABILIFY as well. JONES and the CS also discussed future sales of VIAGRA and CIALIS. The CS stated that he would introduce JONES to the associate of the CS that could distribute the drugs. A surveillance agent observed JONES leave Subject Premises 1 at approximately 1512 hours by himself in Subject Vehicle 1. Subsequent analysis by the FDA Forensic Chemistry Center (FCC) determined that the tablets JONES gave the CS contained ALPRAZOLAM, the active ingredient in XANAX. ALPRAZOLAM is a Schedule IV controlled substance.

10. On February 11, 2014 at approximately 1300 hours, the CS introduced UC1 to FIORE and JONES at Subject Premises 1. A surveillance agent observed JONES arrive in Subject Vehicle 1. JONES and FIORE advised UC1 that they would sell him 2,000 XANAX pills for $4,000, which he should deposit into FIORE's bank account after receiving the pills. The CS later told me that he knew FIORE's account information based on previous unrecorded business dealings. JONES then placed a call to an associate and asked the associate to deliver the pills to him and FIORE at the business. JONES told UC1 he had an AK-47 that he wanted to sell and asked UC1 if he would be interested in purchasing it. UC1 agreed to purchase the firearm for $1,000 dollars, to be paid to JONES directly. JONES also told UC1 that he had a connection for marijuana and JONES would bring a sample of marijuana when they met for the firearm sale. JONES and UC1 agreed to meet the next day for the sale of the firearm. An individual then

arrived at Subject Location 1 and gave a black shoe box to UC1. The shoe box was later found to contain 2,000 pills that appeared to be counterfeit XANAX. Subsequent analysis by the FDA Forensic Chemistry Center (FCC) determined that these pills contained ALPRAZOLAM. Analysis by Pfizer, the manufacturer of XANAX, determined that the tablets closely resembled 2 mg Xanax tablets. Among other things, "Xanax" was embossed on the tablets. "Xanax" is a trademark registered with the United States Patent and Trademark Office. However, close examination of their appearance and laboratory analysis revealed that the tablets were counterfeit.

11. On February 12, 2014 at approximately 1230 hours, UC1 met JONES and FIORE at a coffee shop in the same plaza as Subject Premises 1. JONES received a call and stated that he needed to leave and FIORE would complete the firearm sale with UC1. JONES told FIORE that the AK-47 was in FIORE's office under some insulation where he (JONES) had placed it. A surveillance agent observed JONES exit the parking lot in Subject Vehicle 1. FIORE and UC1 entered FIORE's office on the second floor of Subject Premises 1. Once inside the office, FIORE moved several pieces of insulation that were place on the office floor. Under the insulation was a large silver suitcase. UC1 opened the suitcase and observed a black AK-47 firearm, also found in the suitcase were 3 unloaded magazines. UC1 then provided FIORE with the payment for the firearm which was a total of 1,000 dollars US currency. FIORE then gave UC1 two large black garbage bags to conceal the suitcase with. UC1 then left the business. Subsequent examination determined that the firearm in the suitcase was a ROMARM Rifle, caliber 7.62x39 model GP-WASR 10/63-UF and was marked as being made in Romania.

12. On February 19, 2014, the CS wire transferred $4000 into FIORE's bank account as payment for the 2000 counterfeit XANAX tablets that UC1 had received on February 11, 2014.

13. On February 26, 2014 at approximately 1200 hours, UC1 met JONES and FIORE

at Subject Premises 1. UC1 asked both men for an additional 5,000 XANAX pills. JONES made a phone call on his cell phone to have more pills delivered to them. While JONES was on the phone, FIORE told UC1 that he received the bank deposit into his account for payment of the 2,000 XANAX pills previously given to UC1. FIORE asked UC1 to deposit the money a little quicker next time. UC1 agreed to deposit the payment quicker in the future. FIORE told UC1 that he needed the money to fund the opening of his HAVANA NIGHTS business. During this conversation a white male, later identified as CARBONE, arrived and spoke to FIORE for several minutes, then left Subject Premises 1. A surveillance agent observed leave the parking lot in Subject Vehicle 2. JONES then informed UC1 that he could only provide UC1 with 3,000 XANAX pills. JONES and UC1 agreed to meet back at the business around 1400 hours.

14. At approximately 1400 hours UC1 returned to Subject Premises 1. JONES arrived several minutes later driving Subject Vehicle 1 and parked near UC1. UC1 approached JONES who was standing outside of his vehicle. JONES then opened the trunk of the vehicle and removed a brown plastic bag. Inside the bag was a Ziploc bag containing a large number of tablets. JONES told UC1 that the bag only contained 2,000 XANAX pills. JONES told UC1 that the price of the pills was $1.75 per pill. JONES then informed UC1 that he was working on getting VIAGRA pills for sale and that he would contact UC1 with the price per pill. JONES gave UC1 the bag. Subsequent analysis by the FDA Forensic Chemistry Center (FCC) determined that these pills contained ALPRAZOLAM. Analysis by Pfizer, the manufacturer of XANAX, determined that the tablets closely resembled 2 mg Xanax tablets. Among other things, "Xanax" was embossed on the tablets. "Xanax" is a trademark registered with the United States Patent and Trademark Office. However, close examination of their appearance and laboratory analysis revealed that the tablets were counterfeit.

15. On March 6, 2014, the CS wire transferred $3500 into the FIORE's bank account for the 2000 suspected counterfeit XANAX tablets.

16. On April 17, 2014 at approximately 1300 hours, the CS and UC2 met FIORE at a restaurant located in the same plaza as Subject Premises 1. FIORE had previously stated to the CS that he would have 2,000 XANAX pills for UC2 to purchase. During this meeting, FIORE advised that he did not have the pills in his possession. UC2 agreed to pick up the pills from FIORE on April 29, 2014. During the conversation, FIORE made several references to UC2 about having UC2 "take care" of someone he (FIORE) was angry with. FIORE told UC2 to use the "suitcase" that was sold to UC1 to kill the individual in question. During this meeting a surveillance agent observed Anthony CARBONE arrive driving Subject Vehicle 2. CARBONE approached the table FIORE and UC2 were sitting at. FIORE excused himself from the table and walked with CARBONE to another table. A surveillance agent observed CARBONE sit down at the table while FIORE stood on his left side. The agent then observed FIORE lean in toward CARBONE as if he was speaking into CARBONE's ear. FIORE then placed his hand on CARBONE's neck while UC2 could hear FIORE yelling at CARBONE. FIORE and CARBONE then returned to the table. CARBONE apologized to UC2 for not having the pills ready for him and then left the restaurant. UC2 agreed to return at a later date to pick up the XANAX pills.

17. On April 24, 2014 at approximately 1726 hours UC2 placed a recorded call to FIORE's cell phone. During the conversation, FIORE advised UC2 that he would have 2,000 Snickers bars, common street terminology for XANAX pills, by the next day. FIORE told UC2 that he would be charging UC2 $1.50 per pill for a total of $3,000 which would be deposited into FIORE's bank account. FIORE also told UC2 that he would be receiving another shipment of 5,000 XANAX pills. FIORE told UC2 that once the initial pill deal was complete, he would

charge UC2 a lower amount of $1.00 per pill. FIORE mentioned that he was working on the price of the "drinks". FIORE was referring to acquiring steroids for UC2 to purchase. This was a reference to a previous conversation that they had. UC2 agreed to purchase the 2,000 XANAX pills for $1.50 per pill and would wait on the steroid price.

18. At approximately 1145 hours UC2 arrived at Subject Premises 1. FIORE arrived minutes later. FIORE asked UC2 how many XANAX pills he was willing to purchase on a weekly basis. UC2 told FIORE that the amount of pills would depend on how quickly he would be able to sell the initial pills he would purchase from FIORE. FIORE advised UC2 that he could supply 10,000 XANAX pills without a problem. FIORE told UC2 that he spoke with the "kid" about having a regular supply of pills to meet UC2's needs. UC2 asked FIORE if he was able to supply VIAGRA and CIALIS pills as well. FIORE told UC2 that he previously had 14,000 pills which he had to return up north since he was unable to sell them, but that he could have them returned to him after making a phone call. FIORE stated that the pills came straight from the factory and a deposit would be required before he could order them. FIORE told UC2 that the VIAGRA pills are 100 milligrams and that men will suffer a heart attack if the pills are not cut in half. UC2 asked FIORE if he would be able to supply marijuana, since that was previously discussed between JONES and UC1. FIORE replied that he has a friend who would be at the business and would ask him. FIORE then asked UC2 what type of steroids he would be interested in purchasing. UC2 told FIORE he wanted Testosterone Enanthate, Propionate and Deca (nandrolone Decanoate) and also asked if 23 gauge needles would be supplied. FIORE asked UC2 to text message the names to his cellphone. FIORE stated that he would be getting the steroids from a supplier who has access to a laboratory. FIORE stated he was unsure of the bottle size, but believed they were 10mls and would be sold for $25.00 per bottle. FIORE stated he

would confirm the bottle size and price for UC2. FIORE stated that he would get all the details including if he (the supplier) carried HGH (human growth hormone) from his supplier, since he was involved in "nutrients and body building stuff". FIORE stated he would rather introduce UC2 to the steroid supplier so that both could discuss the steroid details. UC2 asked FIORE if he would be able to obtain another "suitcase" (meaning Ak-47) similar to the one sold to UC1 on February 12th. FIORE told UC2 that he would call the AK-47 supplier and would let UC2 know the following day. FIORE told UC2 that he had someone that he needed UC2 to "take care of" after the grand opening of HAVANA NIGHTS. FIORE told UC2 that during the grand opening he would point out the individual to UC2.

19. Later that day at approximately 1519 hours, FIORE called UC2. FIORE asked UC2 to come to Subject Premises 1. At approximately 1710 hours UC2 returned to Subject Premises 1. As UC2 entered Subject Premises 1, he was greeted by a tall white male with short white hair. The male approached UC2 and gave him a white cardboard box. UC2 accepted the box and asked to speak with FIORE. The white male pointed to FIORE who was seated on a couch. UC2 approached FIORE and FIORE told him that he had 5,000 more of "those". UC2 told FIORE he will let him know about the additional 5,000 and left the business. The white box contained approximately 2,000 apparent counterfeit XANAX tablets, separated in two large Ziploc bags.

20. On May 1, 2014, at FIORE's request, UC2 met FIORE inside Subject Premises 1. UC2 and FIORE discussed the sale of the steroids and FIORE assured UC2 that he would have the steroids the next day. FIORE then gave UC2 a suspected counterfeit 100 dollar bill. FIORE told UC2 to use it and that he had access to a large amount of bills and would sell them to UC2. UC2 took the counterfeit bill and told FIORE he would meet with him the following day. Upon

analysis by the U.S. Secret Service, the bill was determined to be counterfeit.

21. On May 2, 2014 at approximately 1251 hours, FIORE told UC2 via text message that he was currently in Miami trying to purchase a "briefcase," meaning AK-47, for UC2. At approximately 1303 hours UC2 received a phone call from FIORE. FIORE asked UC2 if he liked the "artwork," meaning the counterfeit bill that he received from FIORE on May 1. UC2 advised FIORE that he had a buyer that was interested in purchasing more of the $100 dollar counterfeit bills. UC2 and FIORE began to negotiate the sale of the counterfeit bills. UC2 told FIORE that he would be willing to pay $30 dollars per 100 dollar counterfeit bill. FIORE agreed to the price and said he would speak to his supplier of counterfeit bills to confirm the sale. FIORE then asked UC2 which specific brand of steroid he was interesting in from the list that UC2 had previously provided him. UC2 told FIORE that he was interested in an assortment of all three he mentioned and would want 10 bottles of each type of steroids. FIORE then told UC2 that he would take care of the steroid order that same day. FIORE ended the conversation by telling UC2 that he had not found a "briefcase" and would try one more source before returning to Boca Raton. At approximately 1542 hours, UC2 received a phone call from FIORE. FIORE asked UC2 to meet with him at Subject Premises 1.

22. At approximately 1814 hours, UC2 arrived at Subject Premises 1 and met with FIORE. FIORE advised UC2 that he had been unable to speak with the steroid supplier, even though he had attempted several times and that he would only be able to get a total of 25 bottles of steroids. FIORE told UC2 that he did not find an AK-47 and that he had a friend who would be able to supply one for sale. UC2 told FIORE that he would also be interested in counterfeit 20 dollar bills, since his buyers had shown interest in other counterfeit currency denominations. FIORE stated that he would speak to the counterfeit currency supplier to arrange for UC2 to have

some samples. FIORE told UC2 that he would not be able to get the steroids that day. FIORE and UC2 then exited the front door of Subject Premises 1 and walked to Fiore's car. FIORE opened the trunk and showed UC2 a picture of an individual referred to herein as V1 and V1's written name. FIORE told UC2 that V1 was the individual that he wanted UC2 to "take care of". UC2 asked FIORE if he was asking him to make V1 disappear. FIORE replied "something like that". FIORE then told UC2 that he would ask his wife what she wanted done to V1 before anything was done. FIORE stated he understood what UC2 meant by "disappear" and he would consult with his wife if she wanted V1 dead or hurt. UC2 advised FIORE that this was a serious request, but that he would do his best to accomplish what FIORE was asking. FIORE told UC2 that he wants the V1 issue to be kept quiet and away from the media. FIORE told UC2 that if it was up to him (FIORE) he would want V1 buried underground. UC2 and FIORE agreed to meet as soon as FIORE was able to have the steroids ready.

23. On May 6, 2014 at approximately 1132 hours, UC2 received a phone call from FIORE. During the call, FIORE asked UC2 to meet with him at Subject Premises 1. UC2 told FIORE he would come to finalize the steroid deal. FIORE told UC2 that he had 10 bottles of each cigar, meaning steroids he requested. UC2 asked FIORE about the "suitcase". FIORE replied that he did not have one but had a friend looking on his behalf. UC2 asked FIORE for samples of the counterfeit 100 dollar bills that he could provide his potential buyers. FIORE stated that he would make the necessary phone calls and also get a price for the counterfeit sales.

24. At approximately 1255 hours, UC2 arrived at Subject Premises 1. As UC2 exited his vehicle and began to walk toward the business, FIORE called him and told him to meet with an associate of FIORE's inside HAVANA NIGHTS and the associate would give him the steroids. FIORE also told UC2 to have the associate call him (FIORE) once the steroids were given to UC2.

UC2 entered the business and met with two men whom UC2 had previously met when meeting with FIORE. One of them gave UC2 a black bag which contained the steroids. As UC2 was leaving the business with the steroids, he asked one of the individuals to call FIORE and inform him that he had received the package. UC2 returned to his vehicle. Once inside the vehicle, UC2 received a call from FIORE asking UC2 to meet him at a restaurant located in the same plaza.

25. UC2 entered the restaurant and met with FIORE. FIORE asked UC2 if he had looked at the steroids and UC2 advised him he didn't and left them in the vehicle, in order to finalize the payment for the steroids. FIORE told UC2 that he had provided him with 10 bottles of Testosterone Propionate, 10 bottles of Testosterone Enanthate and 10 bottles of Deca in the bag. UC2 then counted out $1,200 US currency and gave the money to FIORE. FIORE accepted the money and told UC2 that by 1400 hours he should have the samples of counterfeit currency. UC2 asked for another 2,000 XANAX pills. FIORE replied that he still had 7,500 pills available. FIORE then told UC2 that he wanted to wait on harming V1, since he didn't want anything to interfere with the opening of HAVANA NIGHTS. FIORE asked UC2 if he had any connections to the North Carolina area, since he has a potential business opportunity for UC2 there. UC2 told FIORE that he had a buyer who was interested in purchasing the counterfeit currency who travels throughout South America and that he (UC2) wanted 20 and 100 dollar counterfeit bills to purchase for this buyer. FIORE told UC2 that he would make a phone call to acquire the bills he was requesting. FIORE then told UC2 that he had a person looking in New York for "suitcases" meaning firearms for UC2. FIORE told UC2 that his steroid supplier did not have the steroids FIORE had promised because there had been a problem with the product labeling and that in the future FIORE and the steroid supplier would need ample notice to handle a large order. FIORE agreed to sell the XANAX pills for $1.00 per pill if the order totaled 5,000 pills, since he was

getting them directly from the supplier. UC2 asked FIORE about the pill press machine FIORE had previously mentioned. FIORE stated that there were some problems with the press breaking the pills during the manufacturing process. FIORE assured UC2 that this would not affect the supply for UC2. FIORE and UC2 exited the restaurant and began to walk through the plaza, returning to HAVANA NIGHTS. FIORE told UC2 that he will have the counterfeit bills and that FIORE would call him to come back to the business to pick them up. Subsequent FCC analysis determined that vials labeled TESTOSTERONE ENANTHATE INJECTION actually contained TESTOSTERONE ENANTHATE, the vials labeled TESTOSTERONE PROPIONATE INJECTION contained BOLDENONE UNDECYLENATE and the vials labeled DECA DURABOLIN contained NANDROLONE DECANOATE. Each vial contained 10ml of the steroid.

26. On May 6, 2014, at approximately 1539 hours, UC2 received a text from FIORE. FIORE's text stated "You can come by if your still here." At approximately 1539 hours, UC2 replied back stating the following, "Ok, on my way."

27. At approximately 1600 hours, UC2 arrived at Subject Premises 1. UC2 met with FIORE outside the business. FIORE asked UC2 to follow him to his vehicle. FIORE advised UC2 that he had had the counterfeit bills in his pocket, but then had placed them in his car. As both men were walking towards FIORE's vehicle, FIORE advised UC2 that he tried to get a lower price on the one hundred dollar bill. FIORE stated that his supplier told him that if he (UC2) purchased $100,000 dollars of counterfeit money he would give him a better deal per bill. UC2 replied that he would be interested in purchasing a large amount of one hundred dollar counterfeit bills. UC2 asked FIORE to ask his supplier for a final price if he would buy 100,000 dollars in counterfeit money. Once UC2 reached FIORE's vehicle, FIORE opened the front passenger side

door and retrieved a white envelope. FIORE handed UC2 the white envelope, which was sealed. UC2 asked FIORE if there were twenty and one hundred dollar bills. FIORE replied that it was only hundred dollars bills, and that they didn't want to make twenty dollar bills yet, due to the fact that the hundred dollar bills are moving quickly. In addition, FIORE stated that nobody has this type of quality bills. Prior to leaving, UC2 asked FIORE to give him an update on the pills he had requested the previous meeting. FIORE advised UC2 that he could probably have them in three days ready for pick up. UC2 told FIORE he would work on gathering the money necessary. The envelope was found to contain three suspected counterfeit hundred dollar bills.

28. On May 12, 2014, at approximately 1123 hours, UC2 received a phone call from FIORE. During this call, FIORE advised UC2 that he had in his possession the 2000 pills (XANAX) they had talked about on May 6, 2014. FIORE asked UC2 come to Subject Premises 1 the next morning to finalize the sale. UC2 agreed and asked FIORE if he was able to get $5000 dollars in counterfeit money. FIORE stated that he shouldn't have a problem in getting the money. Furthermore, FIORE advised UC2 that the supplier of the money was going to come by his business that day and he was going to ask him about UC2's request. UC2 told FIORE that he had a buyer that was willing to pay $30 per bill ($100 dollar counterfeit bill). FIORE advised UC2 that he would look into the request. UC2 also asked FIORE for 30 more bottles of steroids. FIORE replied that he was going to take care of all of the requests tonight.

29. On or about May 7, 2014, the CS reported that, in an unrecorded conversation, he received permission from FIORE to broker a counterfeit Viagra and Cialis tablet deal with ANDREW BEUSCHEL. The CS explained that it was just a matter of respect not to bypass or cut out FIORE on any deals with BEUSCHEL. On May 8, 2014, the CS received confirmation via a forwarded email message from FIORE's email account (prestigellc8@aol.com) that was

originally addressed from BEUSCHEL's personal email account (flexibletubeman@aol.com) to both of FIORE's email accounts (prestigegroup1@aol.com and prestigellc8@aol.com) that BEUSCHEL would sell and ship "skittles 2710 boxes $6775" and "shipping immediately send funds tomorrow to our account of record" The CS stated that "our account of record" referred to a bank account whose information BEUSCHEL had previously given him in an unrecorded conversation. The email from flexibletubeman@aol.com contained a signature block at the end of the message of Andrew Santo Beuschel-President/CEO Mack Pack, USA, Mack Global Packaging and Innovations, 12 Liberty Place, Medford, NJ 08055, (609) 654-2929 Office/fax, (732) 329-0202 Cell. The email messages from Prestigellc8@aol.com to the CS contained a signature block of Frank J Fiore, Prestige Group, 954-778-8612. The CS stated that "skittles" are code for Viagra and Cialis and that each box referenced by BEUSCHEL actually contains 4 individual tablets of Viagra or Cialis, making this deal a total of 10,840 individual tablets for a total of $6,775. BEUSCHEL requested that the CS wire half the payment for the "skittles" in actual cash and the second half of the "skittles" would be traded for actual product manufactured by the CS. A total of $3,387.50 was wired to BEUSCHEL by the CS and documented in 2 separate wire transfers.

30. On May 13, 2014, at approximately 1013 hours, UC2 placed a call to FIORE. FIORE advised UC2 that he was only able to secure the 2000 pills (XANAX). FIORE stated that he is trying to get ahold of his steroids supplier. UC2 then advised FIORE he would not be able to come to Subject Premises 1 until later in the day. FIORE then replied that it will give him more time to attempt to get in contact with his steroids supplier.

31. At approximately 1310 hours, UC2 made contact with FIORE at Subject Premises 2. FIORE then asked UC2 for the three names of steroids that he needed. UC2 sent

FIORE a text message with the three names; Enanthate, Propionate, and Deca. FIORE then asked UC2 if had anyone up north that could pick up the $5000 dollars in counterfeit money. FIORE stated he spoke to the money supplier and he (the supplier) advised him that he only brought 50 ($100 dollar counterfeit bills) for samples. FIORE stated that his supplier has all the money up in New York. UC2 told FIORE that he did not have anybody up north that he could trust. FIORE then stated that he was working on getting the money down south. UC2 told FIORE that his buyer was interested in investing $100,000 dollars in counterfeit money, but first he wanted to see an initial $5000 of counterfeit currency. FIORE then advised UC2 that he was flying to New York on Friday to take care of some business and if he hasn't received anything by then, he would personally make sure that the money gets back to Florida by next week. UC2 asked FIORE if it was possible for him (FIORE) to bring back the $5000 counterfeit currency when he returned from New York. FIORE refused the suggestion claiming that it would be too risky. FIORE then called his steroids supplier and said "hey does E, P, D gives you a proper hint." FIORE then advised UC2 that his supplier told him that he will have them ready at the business in two hours or less. UC2 advised FIORE that he would return for the steroids in two hours and UC2 and FIORE exited the business together. Once outside FIORE told UC2 that he would be introducing him to his steroid supplier next week. FIORE stated the person supplying the steroids also supplies XANAX pills. FIORE stated that it will be better for UC2 to deal directly with the supplier. FIORE also told UC2 that if UC2 needed something else besides the XANAX and steroids, that he needed to come to him first. FIORE told UC2 that he would call him and say "how is everything, you want to get a drink" during the call and that was the signal to pick up the steroids. Both men then walked to FIORE's car. FIORE opened the truck of the car and retrieved a white plastic bag containing a box Goya Rice & Red Beans and handed it to UC2. FIORE said "here is some Goya

Rice for you". The box was later found to contain 2,000 suspected counterfeit XANAX tablets.

32. UC2 and FIORE discussed VIAGRA and CIALIS pill prices. FIORE advised UC2 that he has a guy up north that could ship any amount of pills to wherever UC2 wanted them to be delivered. FIORE said that the only downside was that this person needs the money wired first. Furthermore, FIORE advised UC2 that each pill would cost about $2.50. Prior to leaving, UC2 asked FIORE if he had access to a handgun. FIORE replied that he might have two extra hand guns at home. FIORE advised UC2 that when he gets home tonight, he would check and see if they were still inside the home. FIORE told UC2 that he wanted UC2 to teach his brother in-law a lesson. FIORE advised UC2 that his brother in-law lives in North Carolina, and that he wants UC2 to break his brother in-law's leg and take all his money and jewelry. FIORE emphasized that the only thing he wants from his brother in-law after he was attacked was whatever watch he would be wearing and that UC2 could keep the rest. FIORE stated that this is a way for him to deliver a message. To clarify what FIORE really wanted done to his brother in-law, UC2 asked FIORE if he wanted his brother in-law to stay alive or dead. FIORE then replied alive but beat up pretty good and to break his leg. FIORE then advised UC2 that he will have all the details on his brother in-law soon. FIORE reiterated that his brother in-law always "carries a nice amount of cash in his pocket and that he's got a diamond cross on him all the time and a watch" which FIORE advised that the watch would be for him. Before ending the conversation FIORE advised UC2 that his brother in-law also owns three night clubs.

33. On May 13, 2014 at approximately 1631 hours, UC2 arrived HAVANA NIGHTS. UC2 entered the business and immediately made contact with FIORE who was talking to an unknown male. FIORE handed UC2 a black bag with the lettering SWOLE Sports Nutrition. As FIORE was handing UC2 the bag, he advised him that the protein shake and the Fat burners

were inside the bag. UC2 asked FIORE how many pounds we were going to lose (meaning how many bottles of steroids). FIORE then replied, "30 at least". The box was later found to contain 30 bottles of steroids: 10 bottles were labeled Testosterone Enanthate, 10 bottles labeled Testosterone Propionate, and 10 bottles labeled Deca Durabolin, Schedule III Controlled Substances.

34. On May 13, 2014, at approximately 1641 hours, UC2 texted FIORE the following, "I was going to give you the papers, but I saw that you were busy" (meaning that UC2 was going to pay FIORE for the steroids, but UC2 saw that FIORE was accompanied by the unknown male). UC2 also texted FIORE the following, "don't forget to check your house for that watch tonight" (meaning not to forget to see if he still had the hand gun). At approximately 1643 hours, UC2 received a phone call from FIORE. FIORE advised him that next time, if that ever happened, to pull him aside so we could finalize the deal. Following his statement FIORE stated that he wasn't worried about not receiving payment. FIORE stated that he knows that UC2 would pay for the steroids. UC2 then advised FIORE that he would be going to his business the next day to deliver him the $1200 dollars for payment of the steroids. FIORE agreed and asked UC2 to call him as he was driving to the business.

35. On May 14, 2014, at approximately 1052 hours, UC2 placed a phone call to FIORE and advised him that would be arriving at Subject Premises 1 shortly. FIORE stated that he was en route to the business also. FIORE told UC2 that he was unable to find the handguns in his home. FIORE stated he thought he may have used them out west. FIORE stated that there was going to be a person coming to his business today at approximately 1 to 2 o' clock and he was going to ask him for the hand gun. FIORE also advised UC2 that FIORE also needed to purchase more handguns. UC2 concluded the conversation by reminding FIORE that his buyer was still

waiting for the 5,000 dollars in counterfeit currency.

36. At approximately 1130 hours, UC2 arrived at Subject Premises 1 in order to pay FIORE $1200 for the steroids he had picked up from FIORE on May 13, 2014. Upon entering the business, UC2 made contact with FIORE. UC2 counted out $1200 US currency and gave it to FIORE. FIORE confirmed that the total payment for the steroids was $1200. UC2 asked FIORE if he would have difficulty supplying a large amount of steroids. FIORE replied that he has access to a large supply. UC2 advised FIORE that if he was going to purchase a large amount of steroids he would have to negotiate a lower price for each bottle. FIORE agreed and UC2 left Subject Premises 1.

37. On May 15, 2014, the CS completed the wire transfer of $3000 into FIORE's bank account for the 2000 suspected counterfeit XANAX tablets.

38. On May 30, 2014, a surveillance agent observed BEUSCHEL park at Mecca Enterprises, 1541 N. Powerline Road, Pompano Beach, FL, exit his vehicle, and meet with the CS. This meeting was recorded audio-only. After the meeting, the CS advised an FDA agent that BEUSCHEL did not bring the Viagra and that BEUSCHEL advised he would ship it to the CS via UPS.

39. In a previous conversation with UC2, FIORE stated that he wanted to separate himself and HAVANA NIGHTS from any future deals of tablets or steroids. On June, 13, 2014, UC2 met with Anthony CARBONE to purchase suspected counterfeit "XANAX" and steroids. At approximately 1300 hours, UC2 arrived at the Biergarten located at 309 Via De Palmas in Boca Raton, Florida and waited for CARBONE to arrive. After CARBONE arrived, UC2 agreed to allow CARBONE to leave and retrieve the steroids, after paying CARBONE $1200. PBCSO Agent Lisa Murray, along with other members of the task force followed CARBONE out of the

area. CARBONE was driving Subject Vehicle 2. The task force followed CARBONE to Hillsboro Blvd. in Deerfield Beach, Florida. CARBONE arrived at a gated development called "The Hammocks". Agent Murray located Subject Vehicle 2 at Subject Premises 2, parked in the driveway. Agent Murray observed no other vehicles parked in this driveway. Agent Murray witnessed CARBONE exit the residence carrying what appeared to be a shopping bag with a picture of a shirtless person on it. CARBONE placed the shopping bag in the trunk of Subject Vehicle 2 and left the development. Agent Murray followed CARBONE to the Target store located at 3599 Hillsboro Blvd., Deerfield Beach, Florida, and witnessed CARBONE park his vehicle next to UC2's vehicle. CARBONE then exited his vehicle, retrieved the shopping bag from his trunk and walked over to UC2's vehicle at which time he placed the shopping bag into UC2's vehicle. CARBONE got into UC2's vehicle and sat in the front passenger seat. After several minutes, CARBONE exited UC2's vehicle and drove off in Subject Vehicle 2. The bag was a Hollister Company shopping bag and contained approximately 30 10 ml vials of suspected Anabolic steroids, to include Testosterone Propionate, Deca Durabolin, Trenbolone and Testosterone blends, suspected Schedule III controlled substances, and approximately 2000 tablets of suspected counterfeit "XANAX".

40. On June 16, 2014, JONES called UC2 and they agreed to meet the next day. UC2 told JONES that UC2 wanted to buy suitcases and JONES said he would check with his supplier. JONES asked UC2 if he needed more pills and they agreed to discuss that the next day.

41. On June 17, 2014, UC2 met JONES at a gas station in Broward County. JONES told UC2 that his gun supplier had already sold the guns that the supplier had. JONES stated that he would try to find an AK-47 for UC2. UC2 told JONES that he had bought Xanax from FIORE and CARBONE. JONES asked UC2 how much he paid FIORE and CARBONE. UC2 replied

that he was starting to pay $1.00 per pill. JONES stated he could get UC2 the same price. JONES stated that he buys from the same supplier as FIORE and CARBONE. JONES offered to sell UC2 "weed" and said he would give UC2 a sample. JONES asked UC2 how much CARBONE was charging UC2 per bottle of steroids and UC2 advised him $40.00. JONES stated that if UC2 requested a big order through him, JONES could get UC2 a better price.

42. On June 23, 2014, the CS turned over to your affiant and other FDA agents a UPS box that was addressed to the CS. The UPS shipping label indicated that the box had been shipped to the CS from FIORE, The UPS Store# 4433, 57 South Main Street, Neptune, New Jersey 07753 on June 17, 2014. The CS stated that the box contained the Viagra that he and BEUSCHEL had emailed about on May 7, 2014 and discussed on May 30, 2014. An FDA agent subsequently opened the box and found that it contained 681 small boxes labeled "Viagra" 100 mg and containing 4 blue tablets each for a total of 2724 tablets. The expiration date stated on the boxes was 4/2014.

43. Analysis by Pfizer, the manufacturer of Viagra, determined that the packaging and tablets closely resembled 100 mg Viagra tablets and packaging. The boxes bore the names "Pfizer" and "Viagra." Furthermore, "Pfizer" was embossed on the tablets. Both "Pfizer" and "Viagra" are trademarks registered with the United States Patent and Trademark Office. Furthermore, the tablets contain the active pharmaceutical ingredient sildenafil citrate, which is a prescription drug. However, close examination of the appearance of the tablets and packaging and laboratory analysis of the tablets revealed that the tablets and packaging were counterfeit.

44. On June 26, 2014 at approximately 1130 hours, UC2 met with CARBONE for the purpose of negotiating the sale of 30 bottles of anabolic steroids to include Testosterone Propionate, Test 400 and Triblend, suspected Schedule III controlled substances, that CARBONE

offered to sell to UC2. The meeting occurred at the Publix shopping center located at 7060 Palmetto Park Rd, Boca Raton. CARBONE arrived again driving Subject Vehicle 2. Your affiant was parked near Subject Premises 2 where we suspected CARBONE lives. CARBONE also told UC2 that he would provide UC2 with a sample of Ecstasy (MDMA) pills for UC2 to sell. CARBONE told UC2 that he needed to pick up the steroids and pills from his residence and they would meet at the Target parking lot located 3599 Hillsboro Blvd, Deerfield Beach to complete the sale. Agents present at the Publix parking lot conducted surveillance by following CARBONE to his residence located at Subject Premises 2. Your affiant observed CARBONE arrive at Subject Premises 2 in Subject Vehicle 2 at approximately 1153 hours. CARBONE left the house at approximately 1216 hours.

45. At approximately 1240 hours, law enforcement agents were present at the Target parking lot and observed CARBONE arrive driving Subject Vehicle 2. Agent Jordan saw CARBONE exit his vehicle carrying a blue box and enter UC2's vehicle. CARBONE placed a blue "ACT Popcorn" box in the back seat of UC2's vehicle. CARBONE told UC2 that the steroids and Ecstasy pills were contained inside the box. UC2 paid CARBONE $1200 for the steroids. CARBONE had a detailed conversation advising UC2 on what price UC2 should sell the anabolic steroids for in order to maximize the financial profit. CARBONE told UC2 that he was looking to purchase a large amount of powder cocaine, possibly a kilo and wanted to broker a deal with UC2. CARBONE asked UC2 if he would be able to transport the kilo of cocaine to New York. CARBONE and UC2 agreed to meet for future narcotic deals and CARBONE exited the vehicle, concluding the deal.

46. On July 6, 2014, the CS forwarded your affiant an email sent to the CS from BEUSCHEL, using flexibletubeman@aol.com asking final payment be made for the "candy"

(counterfeit Viagra previously delivered to CS). The CS responded to BEUSCHEL that all the "candy" (counterfeit Viagra previously delivered to CS) had expired dates. As previously discussed, the counterfeit Viagra's expiration date is labeled as 4/2014. BEUSCHEL responded via email by saying "It's all good take them out of the box that's only the dating".

47. On July 18, 2014, at approximately 1220 hours UC2 arrived at the Subject Location 1 to meet with FIORE. Once inside the business, FIORE told UC2 that he (FIORE) would make contact with CARBONE to facilitate a meet with CARBONE to discuss future steroid sales and a discussion in reference to CARBONE's interest in purchasing powder cocaine from UC2, as UC2 and CARBONE had discussed on June 26. FIORE made contact with CARBONE by phone and FIORE then informed UC2 that CARBONE would meet with UC2 at CARBONE's business Boca Tanning located at 2521 North Federal Highway in Boca Raton.

48. At approximately 1300 hours UC2 arrived at Boca Tanning. UC2 called FIORE and stated that he did not see CARBONE at the business. FIORE reassured UC2 that CARBONE would arrive shortly. Several minutes later Carbone arrived at the business driving Subject Vehicle 2. CARBONE greeted UC2 and both men enterred a Starbucks coffee shop located next door to Boca Tanning. Once seated inside CARBONE advised UC2 that he was unhappy with the way FIORE was accepting payments for the Xanax that FIORE was selling. CARBONE stated that FIORE was leaving a paper trail by only accepting deposits into his (FIORE's) bank accounts and that cash payments are better to avoid detection by law enforcement. Carbone advised UC2 that he wanted to continue selling Xanax and steroids to him, but he was nervous since he had recently been given information by a source stating that the CS is an informant for the "Feds" and had been arrested in connection with a Federal Investigation. UC2 advised Carbone that he was unaware of the CS's legal problems and did not want to obligate Carbone to conduct any sales if he

(CARBONE) did not trust the current situation with FIORE and the CS. Carbone stated that he wanted future deals to not involve FIORE. CARBONE accompanied UC2 to his (UC2's) vehicle. UC2 had previously placed a kilo of powder cocaine in a secured compartment in this vehicle. Both men entered the vehicle and UC2 opened the compartment containing the kilo of powder cocaine and showed it to CARBONE. CARBONE stated that he did not want to touch the kilo for fear of leaving fingerprints. Carbone asked UC2 for a sample of the cocaine. UC2 told CARBONE that he could not cut into the kilo since it was to be delivered to someone, but that he would bring one to sample in the future. CARBONE exits the vehicle telling UC2 that he would contact him to finalize a meeting and deal for the next week.

49. On an email from flexibletubeman@aol.com to the CS dated July 21, 2014 that the CS provided to your affiant, BEUSCHEL stated, "the balance owed is 3,000 and i will get your invoices paid monthly 600 per month send out the pkg & on the 15th of august and the 15th thereafter." The CS stated that the meaning of the e-mail was explained to him by BEUSCHEL in unrecorded conversations to mean that, due to the issue of the delivered counterfeit Viagra's expired dates, the CS needed to create monthly invoices to ship 600 of the counterfeit Viagra pills to an entity provided to the CS by BEUSHEL at the 15th of every month beginning August 15, 2014 until they are all gone.

50. A query of the Department of Motor Vehicles database revealed that Subject Vehicle 1 is registered to JONES and Subject Vehicle 2 is registered to CARBONE.

51. Based on my knowledge, training and experience, and consultations with other Special Agents, I know that the continuing viability of a criminal operation dealing in financial information is dependent upon the storage of such information, either electronically, manually written, or both. The safe storage of such information whether it be electronically or manually

written pertaining to financial accounts and financial transactions including wire transfer instructions and routing numbers are essential to the continuing operations of the enterprise. Additionally, customer lists, customer contact information, suppliers, and bank records derived from business are essential to the continued operations of the enterprise. Persons engaged in these kinds of activities tend to keep this information readily and conveniently accessible either electronically through computer(s), manually written or both. Therefore, I believe that these items will be found at the Target Premises.

52. Additionally, I believe that computer hardware, software, passwords, data security devices, and computer data described in Attachment B and likely to be found at the Target Premises constitute evidence, contraband, fruits, and instrumentalities of illegal activities described herein. I also know that even if electronic information is deleted by a user from a computer, the computer system previously used to store the deleted information often retains evidence of the deleted electronic information. Remnants of files deleted by the user may still remain (in whole or in part) on the storage media because deletion of a file does not necessarily remove that data completely from the media.

53. Based on my training and experience and consultations with other Special Agents, I know that computer data can be stored on a variety of systems and storage devices. As used below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices; beepers and mobile phones; peripheral input/output devices such as keyboards, printers, scanners, plotters. monitors and drives intended for removable media; related communications devices such as modems, cables and connections, storage media such as hard disk drives, floppy disks, compact

disks, magnetic tape used to store digital data (excluding analog tales such as VHS), and memory chips and security devices. Based on my knowledge, training and experience as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of the premises it is not always possible to complete an on-site examination of computer equipment and storage devices for a number of reasons, including the following:

a) Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is rarely possible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, operating system, or software application being searched.

b) The best practices for analysis of computer systems and storage media rely on rigorous procedures designed to maintain the integrity of the evidence and to recover "hidden," mislabeled, deceptively named, erased, compressed, encrypted, or password protected data, while reducing the likelihood of inadvertent or intentional loss or modification of data. A controlled environment, such as a law enforcement laboratory, is typically preferred to conduct such an analysis properly.

c) The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. The hard drives commonly included in basic desktop computers are capable of storing millions of pages of text.

54. This affidavit is submitted in support of a warrant to search three AOL email

accounts. AOL's Compliance and Investigation Unit is located outside the Southern District of Florida, as further described in Attachment A. AUSA Marc Osborne has informed me that this Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711 and § 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

55. In my training and experience, I have learned that AOL provides a variety of on-line services, including electronic mail ("e-mail") access, to the public. AOL allows subscribers to obtain e-mail accounts at the domain name aol.com. Subscribers obtain an account by registering with AOL. During the registration process, AOL asks subscribers to provide basic personal information. Therefore, the computers of AOL are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for their subscribers) and information concerning subscribers and their use of their services, such as account access information, e-mail transaction information, and account application information.

56. On July 23, 2014, I sent a request to AOL to preserve the contents of the email accounts flexibletubeman@aol.com, prestigegroup1@aol.com, and Prestigellc8@aol.com, pursuant to Title 18, United States Code Section 2703(f), for 90 days.

57. As authorized by 18 U.S.C. § 2703(g), I expect to serve the AOL warrant on AOL's Compliance and Investigation Unit, which will then compile the requested records at a time convenient to them. Depending on the custodians' work schedules, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

FURTHER AFFIANT SAYETH NAUGHT.

Maximillian L. Trimm, Special Agent
U.S. Food and Drug Administration
Office of Criminal Investigations

Subscribed and sworn to before me
this 28th day of July 2014

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name:** FRANK FIORE

**Case No:** 14-8295-JMH

Conspiracy to possess schedule I, III and IV controlled substances with intent to distribute, in violation of Title 21 U.S.C. Sections 846 and 841(a)(1) and (b)(1)(B)
* **Max.Penalty**: 5 years' minimum and up to 40 years' incarceration, at least 4 years and up to life on supervised release, $5 million fine

Conspiracy to traffic in counterfeit drugs,
in violation of Title 21 U.S.C. Sections 371 and 2320(a)(4)
* **Max. Penalty:** 5 years' incarceration, 3 years' supervised release, $250,000 fine

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name:** ANTHONY CARBONE

**Case No:** 14-8295-JMH

Conspiracy to possess schedule I, III and IV controlled substances with intent to distribute, in violation of Title 21 U.S.C. Sections 846 and 841(a)(1) and (b)(1)(B)
* **Max.Penalty**: 5 years' minimum and up to 40 years' incarceration, at least 4 years and up to life on supervised release, $5 million fine

Conspiracy to traffic in counterfeit drugs,
in violation of Title 21 U.S.C. Sections 371 and 2320(a)(4)
* **Max. Penalty:** 5 years' incarceration, 3 years' supervised release, $250,000 fine

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
No. 14-8295-JMH

UNITED STATES OF AMERICA

vs.

FRANK FIORE and
ANTHONY CARBONE ,
Defendants.
______________________________/

CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? ______ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? ______ Yes __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: ______________________________

MARC OSBORNE
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No./Court No. A5500796
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401-6235
Tel: (561) 820-8711
Fax: (561) 820-8777
Email: marc.osborne@usdoj.gov